1           IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF GEORGIA
2                  GAINESVILLE DIVISION

3

4

UNITED STATES OF AMERICA,        )
5           Plaintiff,            )
                                 )
6   -vs-                          )   Criminal Information
                                 )   No. 2:20-CR-053-RWS
7   LOUIS BERIA,                  )
            Defendant.            )
8

9

10

          Transcript of the Sentencing Proceedings
11         Before the Honorable Richard W. Story,
          United States District Court Senior Judge
12                  March 9, 2021
                 Gainesville, Georgia
13

14

15   APPEARANCES OF COUNSEL:

16   On behalf of
    the Government:          Christopher J. Huber,
17                           Assistant United States Attorney

18

19   On behalf of
    the Defendant:           Bruce Howard Morris, Esq.
20                           Randy Scott Chartash, Esq.

21

22

23   Reported stenographically by:
    Amanda Lohnaas, Official Court Reporter
24   United States District Court
    Atlanta, Georgia
25   (404) 215-1546

1          (Tuesday, March 9, 2021, 10:00 a.m.; Gainesville,

2     Georgia; all parties appearing via Zoom.)

3          THE COURTROOM DEPUTY:  The Court now calls for

4     sentencing in Criminal Action 2:20-CR-53, United States of

5     America versus Louis Beria.

6          Counsel, please state your name for the record.

7          MR. HUBER:  Good morning, this is Christopher Huber on

8     behalf of the United States.

9          THE COURT:  Good morning.

10         MR. MORRIS:  Good morning, Your Honor, Randy Chartash

11    and Bruce Morris here with Louis Beria on behalf of

12    Mr. Beria.

13         THE COURT:  Good morning.

14         MR. CHARTASH:  Good morning, Your Honor.

15         THE DEFENDANT:  Good morning.

16         THE COURT:  And, Mr. Gilfillan, I understand you are

17    here on behalf of the victim in the case; is that correct?

18         MR. GILFILLAN:  (Nods head.)

19         THE COURT:  I believe you're muted.

20         MR. MORRIS:  I prefer him on muted, Your Honor.

21         THE COURT:  Duly noted, Mr. Morris.

22         MR. GILFILLAN:  Yes, Your Honor, thank you.

23         THE COURT:  Okay.  Very well, and Ms. Johnson, the

24    probation officer, is with us on Zoom as well.

25         Because we are proceeding with this matter by video

1    conference, I need to address a couple of matters with

2    Mr. Beria because we are doing this by video.

3         So, Mr. Beria, let me remind you that you do have the

4    right to be present in court in a public proceeding for

5    purposes of sentencing.  But because of legislation passed by

6    Congress in the CARES Act, there is a provision whereby these

7    proceedings can be conducted by video conference if a

8    defendant agrees to do so.  It's voluntary on your part;

9    you're not required to agree to proceed in this fashion, and

10   you have the right to insist on being present in court for

11   the proceeding.

12        Even though this is being done by video conference, you

13   still have the right to have the public have full access to

14   this proceeding, either by being present in the courtroom or

15   by participating in the video conference, just as you are

16   doing.

17        For the record, I will state that I am presently in the

18   courtroom in the federal courthouse in Gainesville, Georgia.

19   The courthouse is open to the public with certain limitations

20   for health purposes, and all other participants, save my

21   staff, including my courtroom deputy, my court reporter, and

22   my law clerk, are all participating by video conference.

23        First of all, do you understand, Mr. Beria, that you

24   have the right to be present in court for this proceeding?

25        THE DEFENDANT:  Yes, sir.

1          THE COURT:  Are you willing to waive that right and

2    agree to proceed by video conference?

3          THE DEFENDANT:  Yes, sir.

4          THE COURT:  To the extent that the public's access is

5    impaired in any way by the procedure we're using here today,

6    are you willing to waive those rights to public access as

7    well?

8          THE DEFENDANT:  Yes, sir.

9          THE COURT:  And, Mr. Huber, do you have any objection to

10   the Court accepting the defendant's waiver?

11         MR. HUBER:  No, Your Honor.

12         THE COURT:  Mr. Morris, any objection to the Court

13   accepting that waiver?

14         MR. MORRIS:  No objection, Your Honor.

15         THE COURT:  Very well.

16         The Court does find that the defendant has knowingly and

17   voluntarily waived his right to appear physically and agreed

18   to proceed by video conference.

19         I also find that he has knowingly and voluntarily waived

20   any public access rights that may be impaired by this

21   proceeding, and find that the case cannot be further delayed

22   without serious harm to the interests of justice and I will

23   accept the waiver and we will proceed with the sentencing.

24         We are here for purposes of sentencing and the Court has

25   received the presentence report from probation, objections

1    filed to that report on behalf of the parties.  I've also

2    received a sentencing memorandum on behalf of the defendant,

3    which also includes a number of exhibits, letters, and other

4    exhibits.  The Court has reviewed all of those items in

5    advance of today's hearing.

6         There are two guideline objections that are in play, and

7    this is unusual in that both the government and the defense

8    have joined in objections for loss amount and for

9    sophisticated means.

10        I have reviewed those objections and I will state my

11   inclinations regarding those objections and if either of you

12   wish to be heard further, then give you the opportunity to be

13   heard.

14        As to the loss amount, both the government and the

15   defendant object to the loss amount as calculated by the

16   probation officer.  I am going to sustain the objection by

17   the parties based on their objections and the matter stated

18   therein, as well as the plea agreement that was reached by

19   the parties.

20        I do find there's substantial evidence to support the

21   calculations made by the probation officer.  I think she did

22   a very thorough job of reviewing the entire background of

23   this case.  However, based upon the government's

24   representations that there would be issues of proof, both as

25   to the amounts of the losses and to their attributability to

1    criminal fraud and their position that perhaps some of those

2    issues would be better resolved in a civil litigation that's

3    presently pending before the parties, and that this was a

4    part of the plea agreement reached by the parties, I find and

5    will apply the loss amount of $1,621,979, which will result

6    in a 16-level offense level enhancement under the guidelines.

7         As to paragraph 58, both parties object to the two-level

8    enhancement for sophisticated means.  Again, this issue was

9    agreed to by the parties in the plea agreement.  The

10   government takes the position that by focusing on the charged

11   offense and not the other allegedly relevant conduct, that

12   this particular enhancement should not apply.  As I did on

13   the loss amount, I will accept the government's position on

14   this issue, this also was a part of the agreement between the

15   parties, and will therefore sustain the objection on that

16   two-level enhancement.

17        Those rulings would place the defendant at a total

18   offense level of 22 with a criminal history category of I,

19   which would result in a custody guideline range of 41 to 51

20   months.

21        As I indicated, that is my inclination, but I want to

22   give both sides an opportunity to be heard further if you

23   wish to be, though I understand that ruling is consistent

24   with the positions you've previously taken.

25        Mr. Huber, do you wish to be heard further regarding the

1    objections?

2        MR. HUBER:  I don't.  I do want to make the point that,

3    you know, the government is not stating that those losses are

4    unable to be proved in a civil case.  I just want to make

5    that clear, we are certainly not taking that position.  But

6    for the criminal case we believe the objections are

7    appropriate and that the guidelines that you are indicating

8    you're likely to find are likewise appropriate.

9        THE COURT:  And I will state that what you have just

10   stated is consistent with my understanding of the submission

11   that you made on those objections.

12       Mr. Morris, do you wish to be heard further, or

13   Mr. Chartash?

14       MR. CHARTASH:  Yes, Your Honor, thank you, and

15   appreciate the opportunity.

16       We don't object to Your Honor's findings.  We would

17   quibble a bit about certainly the PSR and the findings of the

18   PSR and how thorough they were regarding some of the

19   additional losses but that's not the issue for today.  We

20   agree with Your Honor that the loss amount is the $1.6

21   million and that it was the appropriate guideline range, so

22   we have no further objection -- we have no objections after

23   that.

24       THE COURT:  Very well.  Then I will make that the ruling

25   of the Court and I will adopt the presentence report with

1    those modifications that have been made by the Court.

2        Moving to the 3553 factors, Mr. Huber, I'll hear from

3    the government first and I will give you -- I don't know how

4    you wish to present the government's case.  Obviously, I will

5    give Mr. Gilfillan an opportunity to speak on behalf of the

6    victims, and where you want him to speak in connection with

7    your presentation, I will let you make the call on that.  If

8    you would like to speak and then have him speak for the

9    victims or vice versa, it does not matter to me.

10       MR. HUBER:  Thank you, Your Honor.  I think I would then

11   speak first and then allow Mr. Gilfillan to let the Court

12   hear from the victims.

13       So I too read the sentencing memorandum submitted by

14   Mr. Beria and I was a little surprised by it, frankly.  It

15   almost made his fraud sound like it was a good thing that it

16   happened, that it was not a federal crime that he stole $1.6

17   million from Mr. Wicker.  That sort of bothered me.

18       It bothered me in part because of how Mr. Beria

19   committed the crime.  He got Mr. Wicker to place his trust in

20   him and then took advantage of that misplaced trust.

21       In fact, in one of the letters connected with this, with

22   the charged wire fraud that Mr. Beria pled guilty to, I just

23   want to read a couple of quotes from one of those letters

24   where Mr. Beria lied to Mr. Wicker about how the money was

25   being used.

1       In that letter Mr. Beria wrote to Mr. Wicker:  "I also

2   feel the energy every time I meditate and I see you showering

3   very positive energy towards me.  I follow your teachings on

4   a daily basis and I must thank you profoundly for this great

5   and powerful Vastu energy that you have taught me."

6       A little later in the letter Mr. Beria writes:  "I am

7   doing my very best to protect you and your interests.  They

8   just want money from you.  They are evil, demonic, and very

9   nasty people.  Please be careful, as I am fighting here for

10  you and doing my best."

11      Finally he says:  "Mr. Wicker, I hope you appreciate the

12  onerous job I am doing at looking after your interests with

13  full honesty."

14      This is in the letter where Mr. Beria is lying about how

15  he's using Mr. Wicker's money to hide the fact that he stole

16  it from Mr. Wicker.

17      And so the idea that stealing this money and investing

18  it in Mr. Beria's own apartment complex somehow is a, as I

19  sort of took the sentencing memo, a public good just doesn't

20  jibe with what happened.

21      Mr. Beria stole $1.6 million to enrich himself, to

22  invest in his own property, to invest in rental property that

23  presumably those investments will increase the rents in the

24  future.

25      He also claims in his sentencing memo that he hasn't

1    evicted anyone from those properties since the Covid pandemic

2    started.  And, you know, at least for about half that period,

3    from September, I believe, forward of 2020 through the end of

4    this month, the CDC has put in place an eviction moratorium

5    across the country.  So for at least half that period

6    Mr. Beria is unable to evict anyone, whether he wanted to or

7    not.  So I think that states a little too much.

8         In addition, you know, Mr. Beria, again, not holding him

9    responsible in the criminal loss context, but he reaped

10    millions of dollars from Mr. Wicker over the course of

11    multiple years.  As you know, Mr. Wicker has sued Mr. Beria

12    and others in civil court for trying to recover much of that

13    money.

14         And so while it's appropriate for the guidelines to be

15    focused on the criminal conduct here and the $1.6 million

16    loss amount, the Court shouldn't be blind to the fact that

17    Mr. Beria enriched himself over the course of many years from

18    Mr. Wicker.

19         And Mr. Beria has received a guideline benefit.  The

20    government, as you noted, we agreed that the loss amount

21    would be 1.6, although there could have been arguments that

22    it was greater than that, in particular the conduct charged

23    in the indictment could have been an argument for loss, as

24    the probation officer obviously felt it was in the PSR.  And

25    so that would have been a two-level enhancement, two

1   additional levels.

2       The government believes it was appropriate to limit the

3   loss as it did for the plea for Mr. Beria.  Mr. Beria

4   voluntarily returned from India after the indictment was

5   returned, knowing about the indictment.  He actually very

6   promptly arranged, in the midst of the pandemic, to get on

7   one of the few flights from India to the United States in

8   order to turn himself in.  And he deserves some credit for

9   that and that is part of why the government made the

10  agreements that it did in the plea agreement.

11      We also, as you noted, there was sort of a factual

12  change in circumstances when Mr. Wicker passed away during

13  the pendency of the litigation.  So that made proof issues a

14  little more difficult.  So all of that came into our thinking

15  in reaching this plea agreement.

16      But there's no reason for the Court to vary below the 41

17  months, the low end of the guidelines, as the Court has

18  found, and that's what the United States would urge, is a

19  41-month sentence for Mr. Beria.

20      I'm happy to answer any questions but if you don't have

21  any questions then I would turn it over to Mr. Gilfillan to

22  speak for Mr. Wicker.

23      THE COURT:  Mr. Gilfillan, I'll hear from you.

24      MR. GILFILLAN:  Thank you, Your Honor, for allowing me

25  to speak on behalf of Mr. Wicker and his estate here today.

1       As one of his lawyers, I'm honored and privileged to

2   speak on his behalf, although I'm very sorry that he is not

3   able to speak to you himself about the personal impact of the

4   fraud perpetrated by Mr. Beria.  Mr. Wicker would have

5   expressed far better than I can the personal pain that

6   Mr. Beria caused him.

7       Mr. Wicker passed away on July 20 last year at 84 years

8   old.  Mr. Wicker, who was not born to a wealthy family,

9   worked hard to achieve success in life.

10       If Mr. Wicker were here today he would want the Court to

11   recognize and see that Mr. Beria portrays himself as a sheep

12   and wants the Court to believe he is a sheep, although in

13   reality Mr. Beria is a wolf, a wolf in sheep's clothing.

14       If Mr. Wicker were here he would say the following:

15   Mr. Beria concealed his true nature from me and portrayed

16   himself to me as a dedicated fiduciary who only had my best

17   interests at heart, but I did not discover that, until it was

18   too late, that he is really a charlatan, fraudulently leading

19   me to believe that I could trust him.

20       Mr. Wicker did not discover Mr. Beria's true nature

21   because Mr. Beria repeatedly lied to Mr. Wicker to gain his

22   trust.  Then, as Mr. Wicker's fiduciary, Mr. Beria continued

23   to lie so that he could steal millions.

24       For example, as AUSA Huber mentioned, Mr. Beria sent

25   Mr. Wicker numerous written communications to perpetrate the

1  frauds for which he was originally indicted and the lesser

2  crime that he has pled guilty to in the current matter.

3      I was also prepared to quote some of Mr. Beria's

4  statements to Mr. Wicker, and I won't repeat the ones that

5  AUSA Huber has already described for the Court, but Mr. Beria

6  proclaimed and said to Mr. Wicker in other writings many

7  additional statements that show how -- his true nature.

8      Mr. Beria wrote things to Mr. Wicker like, quote:  "I

9  would like to thank you for your prompt reply and for the

10  trust you have in me.  I promise to never disappoint you and

11  to continue to take care of all things here in full honesty,"

12  end quote.

13      Quote:  "I want to assure you that I am doing my very

14  best to protect you and your interests," end quote.

15      Quote:  "Please be careful as I am fighting here for you

16  and doing my best," end quote.

17      Quote:  "We still have to replace the roofing and

18  resurface all pavements and streets in the entire complex.  I

19  am trying my best to save money to get this project done,"

20  end quote.

21      Quote:  "I will continue to communicate with you

22  directly to keep you informed about all activities here in

23  the USA," end quote.

24      If Mr. Wicker were here he would tell the Court that he

25  believed Mr. Beria, he trusted him, and he relied on these

1    and other lies by Mr. Beria, who made him believe from the

2    beginning that Mr. Beria was a trustworthy person to

3    represent and protect Mr. Wicker's interests here in the

4    United States, and that Mr. Beria pretended to help him.

5        In meetings with Mr. Wicker in 2014 and 2015, and in

6    numerous e-mails and written communications, Mr. Beria took

7    advantage of Mr. Wicker's trust, his fundamental goodness,

8    and the fact that Mr. Wicker did not speak English.

9        Mr. Wicker did not know that he was really dealing with

10   a wolf.  I want to give the Court an example of what he said

11   to Mr. Beria in German that was translated to English in

12   response to statements like those that AUSA Huber and that I

13   have already described from Mr. Beria.

14       Mr. Wicker wrote Mr. Beria, quote:  "I admire your

15   dedication in this regard and have the secure feeling that

16   you are doing your utmost.  I am very eager to quickly write

17   you this letter so that you can already now understand how

18   unreservedly I support you.  With all my heart I wish you the

19   very best.  Thank you most warmly for your work and

20   commitment and wish you much strength and God's blessing for

21   your work," end quote.

22       That is an example of how Mr. Wicker communicated with

23   the man who defrauded him.

24       If Mr. Wicker were able, he would read the sentencing

25   memorandum filed on behalf of Mr. Beria last week and he

1    would tell the Court today that memorandum is misleading.

2        As AUSA Huber, among other things, Mr. Beria claims that

3    he did not enrich himself by stealing 1.6 million of

4    Mr. Wicker's money because he used the money to improve

5    apartments for residents.

6        In reality, Mr. Beria was investing that stolen money

7    for his own benefit, all the while telling Mr. Wicker that he

8    was using the money to improve Mr. Wicker's investment

9    property.

10        Mr. Beria would have the Court believe that his fraud

11    was not used to enrich himself, but the improvements to those

12    apartments were for the purpose of increasing Mr. Beria's

13    property value and garnering more rental income for himself

14    in the future.

15        Mr. Wicker would also say that in claiming to be

16    gainfully employed his entire life, Mr. Beria is concealing

17    from the Court that he spent five years, from 2014 to 2019,

18    stealing Mr. Wicker's money through a variety of other frauds

19    that, as the Court knows, are the subject of civil

20    litigation, although they are not at issue here for reasons

21    beyond Mr. Wicker's control.

22        Mr. Wicker spent the last years of his life knowing that

23    he had been betrayed and defrauded by those he trusted,

24    including Mr. Beria.  He spent his last years embroiled in

25    civil litigation in the United States in an effort to get

1    back what was stolen from him.

2        It is particularly disheartening that after a trustful,

3    generous life, Mr. Wicker's life ended without him getting to

4    see that there is some justice for one who has cheated and

5    lied.

6        If Mr. Wicker were here he would ask the Court to do as

7    much as possible to ensure that Mr. Beria is not able to

8    continue portraying himself as a sheep to fool and defraud

9    more people.

10       We understand that the government has its own reasons

11   for negotiating a guilty plea with Mr. Beria to one of the

12   smaller frauds that Mr. Beria perpetrated against the late

13   Mr. Wicker.

14       Recognizing the law and the realities that flow from

15   such a plea, on behalf of Mr. Wicker, the victim here, given

16   the level of fraud that Mr. Beria actually perpetrated, we

17   would request that Mr. Beria, and say that Mr. Beria should

18   be sentenced to the full extent of the law.  We would request

19   that Mr. Beria be sentenced to 51 months, which is the high

20   end of the recommended custody guideline range as calculated

21   by the Court.  This is also the low end of what the range

22   would have been if the government had required Mr. Beria to

23   plead guilty to the crime originally charged in the

24   indictment.

25       Your Honor, thank you again for allowing me to speak on

1    Mr. Wicker's behalf.

2        THE COURT:  Thank you.

3        Mr. Morris, I'll hear from the defense.

4        MR. MORRIS:  Thank you, Your Honor.

5        First let me say in no way, shape, or form has Mr. Beria

6    denied to this Court, in person or in the presentence

7    memorandum that we filed, that he lied to Mr. Wicker and

8    stole $1.6 million.  There has been no effort to in any way

9    deny that.  It is admitted, openly admitted.

10       In his civil deposition prior to any indictment he --

11       (Screen frozen.)

12       THE COURT:  Mr. Morris, can you hear me?

13       MR. HUBER:  I could hear you, Judge, but I could not

14   hear Mr. Morris, he cut out.

15       THE COURT:  He's frozen on my screen.  Let's take a

16   second and see if we can get him back.

17       (Pause in the proceedings.)

18       THE COURT:  He may be signing back on, let's give him

19   just a second.

20       (Pause in the proceedings.)

21       THE COURT:  Mr. Morris, can you hear me?

22       MR. MORRIS:  I don't know why I lost you, I apologize.

23       THE COURT:  Mr. Morris, where we lost you was you were

24   stating that in his civil deposition prior to his indictment,

25   that is the point at which you froze up for us.

1          MR. MORRIS:  Thank you.

2          Prior to his indictment, in the civil deposition he

3     admitted taking $1.6 million and using it for Yorkminster and

4     telling Mr. Wicker that he had used it for Westminster.  He

5     has never denied that he did that.

6          In our sentencing memorandum we (indiscernible) to what

7     an appropriate sentence would be based on all the 3553

8     factors, taking into consideration his guilt and the

9     guideline range, 41 to 51 months.

10          Your Honor, Mr. Beria, as we point out in our

11     memorandum, is 64 years old.  He voluntarily returned

12     promptly from India when I informed him of his indictment, as

13     Mr. Huber told the Court.  He could have hidden there.  He

14     could have tried to avoid extradition.  In fact, it was very

15     difficult for him to arrange to get back because all flights

16     had been canceled to the United States except for very few.

17          He promptly came back and turned himself in.   In

18     recognition of that, the government was very kind to

19     recommend an unsecured bond of $50,000.  He was released on

20     July 16th, 2020, and has been fully compliant with pretrial

21     services since the time of his guilty plea.  He has been

22     fully compliant with the United States Attorney's Office

23     Financial Unit in sitting for depositions and turning over

24     all financial records that they requested.

25          The critical question, Judge, that we wanted to make

1   clear to the Court is what he used that $1.6 million for and

2   why, why did he use it for Yorkminster.  The answer is

3   Mr. Beria is a product of his early life and his experiences.

4         He was born in Venezuela.  At the time his mother was 16

5   years old.  His father was physically abusive to his mother

6   and to him and his father abandoned his mother, his sister,

7   and him when Louis was only four years old.

8         He and his sisters and mother lived in abject poverty.

9   They lived in a shack made of sheets of metals in a small

10  area in Venezuela.  They had no running water, no bathroom,

11  and, as the presentence report points out, their diet

12  consisted mostly of rice and wild weeds, when they had food.

13  They often went without food.

14        His mother worked as a housekeeper when she could find

15  work; otherwise she scrounged and begged for food for her

16  children and for her.

17        Mr. Beria was unable to enter school on time because he

18  didn't even have a pair of shoes and the school require that

19  he have a pair of shoes, so he started school a year late

20  because of that.

21        As a teenager he began doing whatever work he could find

22  to help the family buy food.

23        In 1986, Louis legally immigrated to the United States.

24  He worked two jobs and it took him two years to earn enough

25  money to bring his wife and children to the United States to

1   join him.  Both he and his wife have become United States

2   citizens.

3        As shown in the letters submitted to the Court with the

4   presentence memorandum from his adult children, he worked two

5   jobs the entire time that they lived in his home to provide

6   for the family.

7        Growing up in poverty as he did, struggling for food,

8   shelter, and clothing had a lasting impact.  When he found

9   the Yorkminster apartment complex, which at that time was

10  called something else, it gave him the opportunity to do

11  something to make life better for families with which he

12  identified.  He used that money to establish a safe haven, a

13  decent place to live, a place that folks who lived there

14  could be proud of, a place where parents could be comfortable

15  that their children would be safe.

16       He took a dilapidated, crime-ridden apartment complex in

17  an undesirable neighborhood and turned it into a safe haven.

18  You have seen the photographs of the before, what it looked

19  like when he bought it, and the after, and there is an

20  incredible transformation.

21       The letters from the apartment complex manager and the

22  maintenance engineer speak about his efforts to create and

23  maintain Yorkminster for the people who lived there.

24       In a moment I'll play for the Court a video of

25  Ms. Phyllis Reid, who is the office manager, and Mr. Pete

1  Dunmyer, who is the maintenance engineer, who couldn't be

2  with us today but wanted the Court to hear their words.

3      The letters offered by the tenants that we made a part

4  of our presentence memorandum tell the story of what

5  Mr. Beria has done and what Yorkminster means to the

6  residents who live there.

7      The photos of the residents and their children safely

8  enjoying life in a decent place to live is what he has done.

9  And as Mr. Huber pointed out, even during the pandemic, when

10  people have been unable to pay their rent, he evicted not a

11  single person from Yorkminster apartments.  Yes, part of that

12  time he wouldn't have been allowed to, but at least six

13  months of that time he could have and did not.

14      Now, Judge, all of this is to explain where the money

15  went and why he did it.  Admittedly, both by Mr. Beria and by

16  counsel, we recognize he did it the wrong way, and the good

17  he has done with the money he stole is no excuse for the fact

18  that he committed a fraud on Mr. Wicker.

19      He lied to Mr. Wicker.  He breached Mr. Wicker's trust,

20  not to the extent that Mr. Gilfillan would have you believe,

21  because many of the facts are contested and in fact refuted,

22  we believe, in the civil case.  But with regard to this $1.6

23  million, he misled Mr. Wicker and he lied to Mr. Wicker.  And

24  he's fully accepted the enhancement to his sentence for that

25  breach of trust.  He did not in any way try to avoid

1    responsibility for that.  He has never denied it.  As we

2    said, even in his deposition prior to indictment he admitted

3    misusing it.

4         He's not a saint, nor do we want to portray him as a

5    saint.  But it is significant that he didn't take the money

6    and put it in to cars or boats or jewelry or stocks and

7    bonds.  Yes, he put it in an apartment complex that he owned

8    and that certainly was a benefit to him, but he could have

9    used it in a way that benefited just him and not other

10   people, and he did not.

11        Your Honor, he's guilty.  He's admitted his guilt.  He

12   understands and accepts that he is to be punished, that he is

13   likely to have punishment that includes incarceration.

14        At 64 years old with medical issues that are common to

15   64-year-olds, the question is how much incarceration is

16   necessary in this case to serve the purposes of 18 U.S.C.

17   3553.  We believe and ask for a below guideline sentence that

18   is just in this case, that serves to punish him for what he's

19   done but does not over-punish him, and we ask the Court to

20   sentence him to a term of imprisonment of one year and one

21   day to be followed by a period of home confinement,

22   restitution of the amount identified by the Court, the

23   appropriate assessment and community service in lieu of a

24   fine.

25        If the Court would allow, I'd like to try and play a

1    five-minute video of one of the witnesses and a second

2    five-and-a-half minute video of the second witness.

3        THE COURT:  You may proceed.

4        MR. MORRIS:  Thank you, Your Honor.

5        THE COURT:  Before you do that, Mr. Morris, can we agree

6    that the videos would be the record?  I'm not going to ask

7    the court reporter to try to take down the statements of the

8    witnesses.  Is that acceptable to the parties?

9        MR. MORRIS:  Absolutely, Your Honor.

10        MR. HUBER:  That's fine, Your Honor.

11        MR. MORRIS:  Thank you.

12        THE COURT:  Okay, you may proceed.

13        MR. MORRIS:  Judge, this is my assistant, who is

14    technologically advanced and I am not.

15        THE COURT:  I can appreciate that.

16        MR. MORRIS:  This is Ms. Phyllis Reid.

17        (Pause in the proceedings.)

18        MR. MORRIS:  Judge, could you ask your clerk to allow us

19    to share the screen?

20        THE COURT:  She is doing that now.

21        (Videotape of Phyllis Reid was played.)

22        MR. MORRIS:  Next one, Your Honor, is about five minutes

23    and it is the maintenance engineer.

24        THE COURT:  Very well.

25        MR. MORRIS:  Mr. Pete Dunmyer.

1          (Videotape of Pete Dunmyer was played.)

2          MR. MORRIS:  Thank you, Your Honor.  Mr. Beria would

3     like to briefly address the Court.

4          THE COURT:  Yes, sir, I'll hear from him at this time.

5          THE DEFENDANT:  Your Honor, today I am scared, very

6     nervous, and I'm here to tell you that I am sorry.

7          I've admitted that I have misled Mr. Wicker.  I have

8     taken the money that belonged to Westminster apartment and I

9     used it in Yorkminster apartment and I lied about it.

10          My intentions were to pay it back.  But at this point in

11     time I can only ask Mr. Wicker's representatives, his family,

12     an apology, forgive me what I have done.  I know I have

13     caused (indiscernible) a lot of people, including

14     Mr. Wicker's family, my own family, my grandchildren, and

15     I've disappointed everyone that knows me, and for that I must

16     pay the price.  Whatever the price is today, I accept, Your

17     Honor, because I've done wrong.

18          Your Honor, I'm 64 years old and I don't remember too

19     much about my life but I do remember vividly my childhood,

20     and my childhood was a very difficult.  I have seen my mother

21     struggle, seen her beaten.  She was a uneducated woman, she

22     could not read or write.

23          I myself, Your Honor, had a very hard childhood.  I was

24     molested in every single way, sexually molested, I was

25     physically molested.

1        And, Your Honor, I can say that these children from

2   Yorkminster, (indiscernible) they are also beat men and woman

3   and they also are about (indiscernible) childhood

4   (indiscernible) and just like I did.  Thank you, Your Honor.

5        THE COURT:  Thank you.

6        I've stated the guidelines that apply in the case and,

7   of course, that is only the beginning of the analysis that

8   the Court is required to engage in in deciding on an

9   appropriate sentence.

10       I'm also to take into account the nature and

11  circumstances of the offense, and certainly we have limited

12  ourselves in terms of the calculations of the guidelines to

13  this specific incident that is charged in the information.

14  But in fairness, it's a part of a larger series of

15  transactions and relationships.  The specifics of how things

16  occurred are still uncertain.  I appreciate that there are

17  matters of proof that still must be resolved and will have to

18  be resolved in the civil litigation.

19       But there is -- it is troubling to me that there is an

20  undercurrent of this type of conduct that is at least

21  indicated in some of -- throughout these transactions and

22  it's troubling and I don't know that they necessarily, I'm

23  not suggesting they all lie at the feet of Mr. Beria, there

24  are other persons who are responsible for certain things that

25  have occurred here.

1        But it's remarkable to me that, as I think about,

2    Mr. Beria, you and where you came from and your childhood,

3    and even since your childhood, since you came to the United

4    States and the life that you have lived here, that you have

5    gone from where you were and the things that you were doing,

6    the life you were trying to make for yourself, for your wife

7    and for your children, this isn't a matter of a person who is

8    struggling and skims off a few hundred dollars or a few

9    thousand dollars to pay the rent or to make sure that his

10   children get something to eat.

11       I have to say it's troubling to me that we've jumped to

12   a million and a half dollars.  This is real money.  And I

13   realize Mr. Wicker was a wealthy person whose wealth exceeds

14   anything I can even imagine.  And I guess it's easy to say a

15   person with that much money, he can afford it, he can miss

16   it.  But to minimize a million and a half dollars is just --

17   this is a huge crime.

18       Let's forget about everything else.  You took $1.6

19   million from another person.  If you'd done this in bank

20   robberies I don't know how much time we'd be looking at, and

21   I'm not suggesting you held a gun to someone's head and made

22   them give it to you.  Some people would say it would have

23   been better to have done that than to have betrayed the trust

24   of another person, an older person who put his trust in you

25   to take care of his business and take care of his affairs.

1    So I find the crime here to be a serious crime.  The
2  fact that Mr. Wicker was a wealthy man does not make him any
3  less entitled to the protection of the law than a poor man.
4  So it's bothersome to me and it just troubles me when I think
5  about you and the person you are, I appreciate the tough
6  childhood you had and I admire you for what you did to pull
7  yourself out of that.  You came to this country, you got a
8  new start.  You got citizenship.  You followed the law.  You
9  brought your family here.  You tried to make a better life
10 for them.
11    And then you chose to get in with this group of people,
12 I don't know whose fault it was, it's perhaps not all of
13 yours but you've got to take some responsibility for this, to
14 engage in this kind of conduct, and it's serious.
15    I really appreciate what you did with the money in terms
16 of helping other people, I do think it helped other people.
17 You transformed this facility, this property.  The pictures
18 are shocking, what you took it from and took it to, and I
19 commend you for that.  But you did it with $1.6 million of
20 somebody else's money and at the end you had yourself a nice
21 property and Mr. Wicker was out $1.6 million.
22    You know, this wasn't a -- I appreciate you say you
23 thought you would pay it back some day.  Well, if you wanted
24 a loan, you had a fellow there who believed in you and
25 trusted you, you should have asked him for a loan; you

1    shouldn't have taken 1.6 million of his dollars.

2        And I appreciate that you haven't evicted anyone and I

3    realize there's a bit of a moratorium on that.  And I also

4    realize there are rent subsidies.  And in fairness, you

5    helped find the agencies that would help these people, but it

6    also helped you because you got paid your rent with a 10

7    percent discount, as I understand it, so you continued to

8    have at least some income from this property.

9        But I'm enough of a businessperson to know when your

10   investment is zero, and I'm not suggesting it is, I know you

11   had to buy the property, but when you didn't pay the 1.6

12   million to refurbish it, you don't need to make as much to

13   still be making money.

14       You know, again, I appreciate the property and what it's

15   done for that community and I can only imagine how

16   appreciative your tenants are, they should be, you have done

17   them a great service in that regard.  But you can't dress up

18   a crime and make it not a crime.  It is still a crime and it

19   is still a violation of the law.

20       So those are factors in terms of the nature of the crime

21   and you and your history.  And, again, I admire you.  You are

22   the immigrant into this country that I want to admire, the

23   person who follows the law and comes here and pulls himself

24   up by his bootstraps and makes a life for himself and for his

25   family.  But then you betray that for yourself and for others

1    when you choose to follow this path and to take advantage of

2    another person.

3        I'm supposed to think about what it would take to deter

4    you from engaging in this conduct again.  Hopefully, whatever

5    sentence I impose it is not going to be the main thing,

6    hopefully your own reflection on what you've done and the

7    decision to never engage in something like this has already

8    been made.

9        And a suggestion that it has is evidenced by your

10   willingness to return and answer to these charges.  Again,

11   that's something I give you credit for and I salute you for

12   that, I think that's wonderful.  There are those who would

13   have just tried to abscond and never come back and face the

14   consequences.  And I appreciate, that says something about

15   your character, that you returned to the country and went to

16   some trouble to get yourself back here to face this and to

17   own up to and accept the responsibility for it.

18       Certainly I have to consider what it takes to deter

19   others and the types of sentences that are available, the

20   need to avoid sentencing disparity, and, in all candor, the

21   guidelines help us with that because we see what other people

22   would face in similar circumstances.

23       Mr. Beria, in my view, and I've been very honest with

24   you to this point and I will be very honest with you to the

25   very end, I'm going to put it all out there for you, in my

1    view your lawyers have done a wonderful job for you and have

2    gotten what I think is a good plea arrangement for you,

3    because you saw the presentence report and the possibility

4    that the Court could have, and there was a basis for

5    attributing a lot more of this conduct to you than was

6    attributed, there's a basis there for it.

7         And while this is a criminal case, to take that into

8    account for your sentencing, the government would not have

9    had to prove it beyond a reasonable doubt; it would be just

10   like a civil case, it would be preponderance of the evidence.

11   So there would be that there.  But you've gotten the benefit

12   of the agreement and I've given you the full benefit of that,

13   I've held the government to its agreement.  I have not gone

14   beyond the loss amount.  I have not given additional points

15   for other matters that could arguably have been given in this

16   case because that's the agreement you reached with the

17   government and I'm going to honor that agreement as the

18   government has chosen to honor it here.

19        But taking all of those factors into account, I am

20   sorry, I can't give you a sentence of a short-term sentence

21   or a probation sentence, it's just to me not appropriate, it

22   does not reflect the seriousness of this offense.

23        It's my judgment that you be committed to the custody of

24   the Bureau of Prisons for a term of 51 months.  I will allow

25   you to voluntarily surrender to serve that sentence.

1      I will order that you not be required to report before

2   June 1 of 2020, and I'm doing that because in case you

3   haven't gotten a vaccine, I want you to have time to get a

4   vaccine before you report to serve your sentence.

5      You will be required to pay a special assessment of

6   $100.  You'll have to pay restitution in the amount of

7   $1,621,979 to the Werner Wicker estate.

8      In light of that sum of restitution I am not going to

9   impose a fine because that is a significant enough financial

10  obligation for you.  That is due and payable immediately and

11  will be a condition of your supervision as well to be paid at

12  a rate of no less than $500 a month.

13     You will be placed on supervised release for a term of

14  three years with the standard mandatory conditions that you

15  not violate any federal, state, or local laws, that you not

16  unlawfully use or possess any controlled substances, and

17  submit to the collection of DNA.

18     I'm going to waive drug tests at this point because

19  you're receiving various treatments and so forth.  I'm not

20  going to require that you submit to drug screens unless there

21  are issues that arise with you that would require or make

22  that necessary.  However, you will be subject to searches and

23  confiscation of contraband in order that the probation

24  department may assure your full compliance with the avoidance

25  of any other legal activity.

1        So long as you have a financial obligation outstanding
2    you will be required to make a full and complete disclosure
3    of your finances and not incur new credit charges or open
4    additional lines of credit without the approval of your
5    probation officer.
6        I will also provide that, to the extent mental health
7    program is appropriate, that you would be required to
8    participate in any such program and take any medications
9    associated with that.
10       Under the terms of the plea agreement that you reached
11   with the government it does not appear that you would have a
12   right to appeal the Court's sentence.  To the extent that you
13   believe you have reserved a right, I will ask that Mr. Morris
14   protect your interests in that regard because any appeal
15   would have to be filed within 14 days or you would have given
16   up the right of appeal.
17       Objections to the sentence as imposed from the
18   government?
19       MR. HUBER:  No objections, Your Honor.  I may have
20   missed it but I didn't hear you order forfeiture.  You had
21   signed the --
22       THE COURT:  Yes, I was going to ask you about that.  Are
23   you seeking -- as I understand it you're seeking a money
24   judgment forfeiture; is that correct?
25       MR. HUBER:  Yes, Your Honor.

1        THE COURT:  In the amount of the restitution?

2        MR. HUBER:  Yes.

3        THE COURT:  And the Court will so order.  As I recall

4    that was a part of the plea agreement and I so order that and

5    will make that part of the J&C.

6        MR. HUBER:  Thank you.

7        Two other things.  I think you said he needed to

8    surrender by June 1st of 2020, I assume that was 2021.  I may

9    have misheard.

10        THE COURT:  I probably said 2020.  I meant 2021, yes.

11        MR. HUBER:  And then finally, if you could just direct

12    Mr. Beria to remain, continue on supervision as he has until

13    he does surrender to the Bureau of Prisons.

14        THE COURT:  Yes, you will be subject to your same

15    conditions of supervision pending reporting.  You'll be

16    notified by the bureau when and where to report, and

17    obviously it's critical that you report at that time and

18    place or you could be subject to a new charge for escape, so

19    it's important to do that.

20        Objections from the defense, Mr. Morris?

21        MR. MORRIS:  No objections, Your Honor.

22        I would ask with regard to the judgment, if Your Honor

23    would allow the interest to not run until his release from

24    custody?  It's really onerous on somebody to keep falling

25    behind and have no ability to pay.

1       THE COURT:  I will so order that the interest will

2  commence upon release from custody.

3       MR. MORRIS:  Thank you.

4       And could we ask Your Honor to recommend to the Bureau

5  of Prisons that his sentence be served at Maxwell Air Force

6  Base in Montgomery, Alabama?

7       One of the reasons we ask for that is we'd also ask the

8  Court to recommend that he participate in the RDAP alcohol

9  program.  As the presentence report points out, he definitely

10  has an alcohol abuse problem.

11       THE COURT:  Well, I missed that.  I'm sorry, I missed

12  that.  I will order that, but in that regard I will order

13  that he not use alcohol and that he submit to screens as well

14  and participate in treatment.  So I will go back and amend

15  the order to that effect and I will recommend the RDAP

16  program in that connection.

17       MR. MORRIS:  Thank you, Your Honor.

18       THE COURT:  I'm not willing to recommend Maxwell because

19  my tendency in terms of recommending prisons is based on

20  families and location.  Part of that is just a perception

21  that Maxwell is the easy way out, not that it is, but I mean,

22  that's the perception and so I prefer not to do that.

23       My geographic recommendations are tied to a specific

24  program, if there is one, or a need to be near family.  And I

25  don't know that Maxwell necessarily serves either of those

1    for this defendant.

2        MR. MORRIS:  If it please the Court, it does have the

3    RDAP program and it's about as close as we can get to a place

4    that has an RDAP program that will allow him to do whatever

5    he can to operate with the folks who are going to be handling

6    the property and deal with making the restitution through

7    folks that are going to help him, they're located around

8    here.

9        THE COURT:  Then I'm willing to say that they place him

10   as close to Atlanta as possible and recommend the RDAP

11   program.

12       MR. MORRIS:  That's my concern, Judge, the Atlanta Camp

13   doesn't have that program.  Maxwell is about as close as we

14   can get.

15       THE COURT:  I will recommend that he be placed as close

16   to Atlanta as possible and will recommend that he have the

17   RDAP program wherever he's placed.

18       MR. MORRIS:  Thank you.

19       THE COURT:  Yes, sir.

20       Mr. Beria, I know that is not the sentence you came here

21   today hoping to receive but I hope you understand that I'm

22   trying to strike a balance between what is fair for both the

23   victim, as well as for you, and reflects the seriousness of

24   the offense that you have committed here.

25       It is critically important that restitution be paid, and

1    certainly the sooner you can make that happen, the better.

2    That could have an impact on the length of your supervision

3    and other factors.  So I encourage you to see to that at the

4    earliest possible time.  It certainly is viewed well by the

5    Court when a party does take care of his obligations, his

6    financial obligations, particularly to victims.

7         It's my hope that you will be able to get through this

8    and when you are done, get out and proceed with a productive

9    life.  You're obviously a quite capable person who can

10   succeed in life.  You have children who love you and are

11   there for you and I hope you are able to complete this and

12   return to a life that is productive and that you're able to

13   right any of these other wrongs that may be existing out

14   there as well.  I wish you the best of luck.

15        We are adjourned.  Thank you.

16        (Proceedings concluded, 11:15 a.m.)

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

4    UNITED STATES DISTRICT COURT:

5    NORTHERN DISTRICT OF GEORGIA:

6

7              I hereby certify that the foregoing pages, 1

8    through 36, are a true and correct copy of the proceedings in

9    the case aforesaid.

10             This the 12th day of March, 2021.

11

12

                           /s/ *Amanda Lohnaas*
13             _____

14                         Amanda Lohnaas,
                           Official Court Reporter
15                         United States District Court

16

17

18

19

20

21

22

23

24

25